UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOU THAO,<br><br>    Plaintiff,<br><br>v.<br><br>JOE DOBIE, et al.,<br><br>    Defendants. | Case No. 16-cv-01098-PJH<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 26, 28 |

This is a civil rights case brought pro se by a state prisoner under 42 U.S.C. § 1983. His claims arise from his detention in San Quentin State Prison ("SQSP"). Plaintiff alleges that defendants were deliberately indifferent to lead-and asbestos-related risks while plaintiff and other inmates were working in the inmate mattress factory in May and June 2012. Defendants Dobie, Earley, Loredo and Smith have filed a motion for summary judgment. Defendant Young has separately filed a motion for summary judgment. Plaintiff has filed an opposition and defendants filed replies. For the reasons set forth below, the motions are granted.

## BACKGROUND

Previously, six other related actions were brought in this court asserting the exact same claims of asbestos and lead paint exposure at the mattress factory in May and early June 2012. The six related actions were *Terry v. Smith*, C 13-1227 EMC; *Carter v. Smith*, No. C 13-4373 EMC; *Spells v. Smith*, No. C 13-4102 EMC; *Hirscher v. Smith*, 14-340 EMC; *Arnold v. Smith*, No. C 13-4456 EMC; and *Beyett v. Smith*, No. C 14-3153 EMC. The six prisoner-plaintiffs appeared to be coordinating their efforts, as their pleadings, requests, oppositions, and exhibits were similar. On the other side, and

similar to this case, the defendants were represented by the Law Office of Nancy E. Hudgins, except for Jeremy Young, who was represented separately by attorney Kenneth Williams. Defense motions for summary judgment were filed in five of the six cases; one was not filed in the *Arnold* case because it proceeded at a slower pace.

The court chose one case (*Carter*), went through the evidence in that case, and issued an order granting in part and denying in part defendants' motions for summary judgment. The court then sent to the parties in all six cases the lengthy order in the *Carter* case, explaining that the ruling in *Carter* was not technically dispositive of the motions for summary judgments in each of the other related cases, but that the ruling showed the court's evaluation of the evidence and provided enough guidance for the parties in all six cases to have a good sense of their relative positions for settlement purposes. The court then referred all the cases to a magistrate judge for settlement proceedings. Four of the actions settled, and two-T*erry*, C 13-1227 EMC and *Arnold*, No. 13-cv-4456 EMC-continued. New motions for summary judgment with additional evidence were filed in *Terry* and *Arnold*, and on December 2, 2016, the court granted the motions and the cases were closed. This case, while not identical, is substantially similar to the six closed cases, and both sides submit substantially similar arguments and evidence; however in this case, it is undisputed that plaintiff has suffered no medical problems and is in good health.

**DISCUSSION**

**Motion for Summary Judgment**

**A.    Summary Judgment Standard**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. *Id.* If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id.*

### B. Eighth Amendment Standard

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Deliberate indifference to an inmate's health or safety may violate the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer*, 511 U.S. at 834.

Exposure to toxic substances may be a sufficiently serious condition to establish the first prong of an Eighth Amendment claim, depending on the circumstances of such exposure, as explained by the Supreme Court in *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (inmate stated Eighth Amendment claim based upon possible future harm to health, as well as present harm, arising out of exposure to second-hand smoke). The plaintiff "must show that he himself is being exposed to unreasonably high levels" of the toxic substance. *Helling*, 509 U.S. at 35. Moreover, determining whether the condition violates the Eighth Amendment "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxic substance]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such

3

a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

Although *Helling* was a second-hand smoke case, the rule also applies to asbestos exposure. In *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995), the Ninth Circuit cited *Helling* in a case in which an inmate had been exposed to asbestos during a prison cleaning operation. The *Wallis* plaintiff extensively handled asbestos-containing materials when he was on a work detail required to clean an attic with damaged asbestos-containing insulation on pipes and insulation material that "had broken loose and lay scattered around the attic" with other debris. *Id.* at 1075. Wearing inadequate masks, the inmates were required to "tear off loose pipe covering and insulation" and bag it for disposal in a dusty attic without outside ventilation. *Id.* The court in *Wallis* spent little time discussing whether the objective prong was satisfied for the Eighth Amendment claim because it was "uncontroverted that asbestos poses a serious risk to human health," and the plaintiff's medical expert had declared that the amount of exposure for that plaintiff was "medically serious," *id.* at 1076.

Other circuits also have cited *Helling* in cases involving toxic substances such as asbestos. *See, e.g.*, *Templeton v. Anderson*, 607 F. App'x 784, 787 (10th Cir. 2015) (summary judgment proper for defendant because requiring inmate to work for one hour removing asbestos mastic and tiles "was not a significant duration given the type of exposure at issue" and therefore did not satisfy the objective prong of Eighth Amendment claim); *Smith v. Howell*, 570 F. App'x 762, 765 (10th Cir. 2014) (affirming summary judgment on qualified immunity grounds on Eighth Amendment claim because there were no Tenth Circuit or Supreme Court cases by 2003 that had held "that a limited exposure to asbestos dust for a few hours poses such an objectively serious risk of future harm to offend contemporary standards of decency. Indeed, there is no such authority even today."); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (finding genuine issues of fact as to whether plaintiff was exposed to levels of asbestos sufficient to pose an unreasonable risk of damage to his future health based on his two-month stay in a facility "contaminated with asbestos to which inmates were routinely exposed," but that summary

4

judgment was proper because he alleged no physical injury and, pursuant to 42 U.S.C. § 1997e(e), he could not recover damages for mental and emotional stress without physical injury); *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) (Eighth Amendment claim properly dismissed because being housed in a cell for ten months near asbestos-covered pipes was not a serious enough condition; plaintiff "does not allege facts sufficient to establish that he was exposed to unreasonably high levels of asbestos. Had, for example, [plaintiff] been forced to stay in a dormitory where friable asbestos filled the air, we might agree that he states a claim under the Eighth Amendment. That, however, is not this case. . . . [T]he fact remains that asbestos abounds in many public buildings. Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual.")

### C. Facts

The following facts are undisputed except where indicated otherwise:[1]

Plaintiff was incarcerated at SQSP during the relevant time. Compl. at 4; Motion for Summary Judgment filed by Dobie, Earley, Loredo and Smith ("MSJ1") (Docket No. 26); Pl.'s Dep. 7:23-24, 8:21-23. From 2010 to June 7, 2012, plaintiff was an inmate worker at the Prison Industry Authority ("PIA") mattress and bedding factory. Pl.'s Depo. 11:18-20, 15:5-7. Plaintiff never returned to the factory after June 7, 2012. *Id.* 15:16-17.[2]

In late May 2012, the PIA stopped factory operations for annual cleaning and inventory. MSJ1 Ex. 2, Dobie Decl. ¶¶ 3-4. Plaintiff and other inmates used a power washer to clean the ceiling for approximately 10 days in late May to early June. Compl. at 9; Opp'n at 2. While washing the ceiling, fibers and other particles were released into the air. Opp'n at 2-3. Plaintiff was wearing a mask, but the packaging states the mask does not protect against asbestos. Opp'n at 2.

---

[1] Plaintiff's opposition (Docket No. 32) contradicts several statements plaintiff made in his deposition. It appears that the opposition was prepared by plaintiffs in the other six cases. Opp'n at 2. The deposition occurred on February 6, 2017, and the opposition was filed on May 10, 2017.
[2] In the deposition, plaintiff is clear that he has not returned to the factory. The opposition states that he still works in the factory and continues to be exposed to lead and asbestos. Opp'n at 3, 7.

5

On June 6, 2012, a maintenance supervisor expressed concern that the cleaning process could possibly result in lead or asbestos exposure. MSJ1 Ex. 3, Earley's First Decl. ¶ 7. The factory was closed for inspection and abatement of any hazardous substances. MSJ1 Ex. 4, Loredo Decl. ¶ 7.

No asbestos was found in the areas where inmates worked. Earley's First Decl. ¶ 8; Dobie Decl. ¶14. Dust samples collected from around the factory tested negative for any asbestos. Loredo Decl. ¶ 8; Compl. at 48. A small amount of asbestos was present under floor tiles in the factory supervisors' office, and trace amounts were detected in glazing putty around the supervisors' office windows. Earley's First Decl. ¶ 9. Some lead-containing paint was found on some exterior swing-out windows. Earley's First Decl. ¶ 9. The wrapping around the ceiling pipes was assumed to contain asbestos, but was not tested. *Id.* The wrapping was in good condition. *Id.*

Photos of the factory show an open and airy workspace with a ceiling that is at least 12 feet high and a limited number of pipes running near the ceiling. The pipes are covered with what appears to be insulation wrapped with tape, although there is no visible writing on the pipe covering. The portions of the pipe covering that are disturbed are quite limited in number, and the disturbed areas are confined in size; no disturbed area appears to be bigger than six inches long. The disturbed areas on any particular pipe appear to be few and far apart. Opp'n at 27-62.[3]

The inmate workers at the factory were tested, and none tested positive for lead exposure. MSJ1 Ex. 5, Earley's Second Decl. ¶ 4. Some inmate workers requested testing for possible asbestos exposure. MSJ1 Ex. 7, letter to Dewey Terry from Cal. Corr. Healthcare Servs. The request was denied because asbestos-related diseases generally only occur years after prolonged, substantial exposure and because the testing is invasive and ineffective until the disease manifests itself. *Id.*; MSJ1 Ex. 8, Piatt Decl. ¶¶ 6-8.

---

[3] Some of the photos contain people, which allows the viewer to have a sense of the size of the factory and the damage to the pipes. Opp'n at 30-31.

Plaintiff is unaware if there was any asbestos in the factory. Pl.'s Dep. 12:14-23. Plaintiff recalls seeing only one sign warning of the possibility of asbestos and lead paint. *Id.* 12:21-13:8. Plaintiff is unaware of any evidence that he was exposed to any lead or asbestos in the factory. *Id.* 11:22-25, 12:14-13:19, 14:21-15:4, 18:11-18. Plaintiff is unaware of any evidence that defendants were aware of any risk of lead-or asbestos related-harm. *Id.*, 28:24-29:6.

Plaintiff's blood was tested on June 8, 2012. Opp'n at 97-98. The report states that the level of lead in plaintiff's blood was less than 2.0 mcg/dL (i.e., micrograms per deciliter) for lead in the blood. *Id.* at 97. The report states that the reference range is 0.0 to 10.0 mcg/dL and blood levels in the range of 5-9 mcg/dL have been associated with adverse health effects in children aged 6 years and younger. *Id.* The report also stated that, with respect to zinc protoporphyrin, plaintiff had a level of 39 and the reference range was less than 100 mcg/dL. *Id.* at 98.

Plaintiff does not know if he has suffered any type of lead-related harm. Pl.'s Dep. 26:3-13, 28:24-29:6. On the date of the deposition, February 6, 2017, plaintiff stated he was healthy. *Id.* 26:14-17.

Defendants present a declaration from a medical expert, Brad Piatt, M.D., who obtained his A.B. in biochemistry and completed post-graduate work in biochemistry at U.C. Berkeley, obtained his medical degree at Vanderbilt University, and now is a board-certified radiologist. MSJ1 Ex. 8, Piatt Decl. ¶ 1. Dr. Piatt has "obtained substantial experience with asbestos and asbestos related medical illnesses during the analysis of diagnostic imaging for over a thousand patients being evaluated for asbestos exposure in order to determine the presence, type and extent of disease." *Id.* Dr. Piatt states that "[a]sbestos-related illness only develops after chronic, prolonged exposure to significant concentrations, most diseases occurring years or decades after substantial exposure." *Id.* ¶ 8. With regard to the claimed lead exposure, Dr. Piatt declares that, "[i]n adults, lead inhalation rarely results in medical disease unless there is prolonged exposure to high concentrations." *Id.* ¶ 16.

According to several government authorities, "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe to individuals exposed to the fibers." 20 U.S.C. § 3601(a)(3) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980); *id.* § 4011(a)(3) (Congressional statement of findings and purpose for the Asbestos School Hazard Abatement Act of 1984). "[E]xposure to asbestos fibers has been identified over a long period of time and by reputable medical and scientific evidence as significantly increasing the incidence of cancer and other severe or fatal diseases, such as asbestosis." 20 U.S.C. § 3601(a)(1) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980). Although making these findings about the general hazard of asbestos, Congress did not choose to close all potentially affected schools and instead directed that a task force be established, that states prepare plans, and that financial and other assistance be provided to states to address the problem. *See* 20 U.S.C. § 3601(b).

The Occupational Safety and Health Administration ("OSHA") has regulations that do allow some asbestos exposure for workers. One regulation sets a "permissible exposure limit" for employee exposure to asbestos. *See* 29 C.F.R. § 1910.1001(c)(1) ("The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average"); *id.* § 1910.1001(c)(2) ("The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 1.0 fiber per cubic centimeter of air (1 f/cc) as averaged over a sampling period of thirty (30) minutes").

**ANALYSIS**

Plaintiff has failed to demonstrate a triable issue with respect to either the objective or subjective prong of his Eighth Amendment claim. He has not shown that the alleged deprivation was sufficiently serious or that defendants were deliberately indifferent to his safety.

**Objective Prong**

Plaintiff only argues that for several days he and others used a power washer and disturbed pipes that could have contained asbestos. It is undisputed that there is no evidence that plaintiff was exposed to asbestos or lead. The testing from the area where plaintiff was working tested negative for asbestos, and plaintiff presents no evidence of any irregularities in his blood tests or in those of the other inmate-workers. That there were particles in the air while cleaning the ceiling and pipes does not show that asbestos was present or that plaintiff was exposed to dangerous amounts of any toxic substance. The pictures that plaintiff submitted only demonstrate a few small, disturbed areas of pipe in a large, open, and airy workspace. In contrast to the facts of *Wallis*, plaintiff has failed to establish any evidence that he was exposed to unreasonably high levels of a toxic substance. In *Wallis*, the plaintiff directly and extensively handled asbestos in an enclosed space, a dusty attic.

It is also undisputed that plaintiff is currently healthy and has had no adverse medical problems. Defendants submitted expert evidence that asbestos-related diseases usually require a significant and prolonged exposure to asbestos as opposed to the at most minimal degree of exposure at issue in this action. Plaintiff's conclusory allegations that there could have been asbestos and that he could have been exposed to a dangerous amount are insufficient to meet his burden and survive summary judgment.

His allegation that the mere possibility that he was exposed to asbestos violates the Eighth Amendment does not satisfy the standard set out in *Helling*. Plaintiff fails to present evidence that would allow the court or a jury to perform a scientific and statistical inquiry into the seriousness of probable harm and the probability that any health-related injury will be caused by exposure to asbestos or lead. *See Helling* at 36.

Even if there was a small amount of asbestos in the factory and plaintiff was exposed, he has still failed to show a sufficiently serious deprivation. OSHA regulations set limits on asbestos exposure and allow some small exposure to workers. These regulations contradict plaintiff's general assertion that any exposure to asbestos would meet the high standard for an Eighth Amendment deliberate indifference claim.

**Subjective Prong**

Plaintiff has also failed to present evidence that even if there was a sufficiently serious deprivation, that defendants were deliberately indifferent to his safety. Plaintiff conceded in his deposition that he was unaware of any evidence that defendants were aware of any risk of lead-or asbestos-related harm. In his opposition plaintiff includes a declaration from another inmate who states that he had told a defendant there was asbestos in the factory. Opp'n at 129-130. Yet, this declaration does not describe how the inmate knew that the material was asbestos or how much asbestos was in existence at the factory. Nor does the declaration describe how much asbestos material was disturbed in the cleaning of the factory. Even assuming a defendant had been told by an inmate that there was asbestos, the defendants were not deliberately indifferent in their actions based on the undisputed facts discussed above. Moreover, if there was a triable issue on this subjective prong and the warning from the other inmate, defendants are still entitled to summary judgment because plaintiff has not shown a triable issue on the objective prong of a sufficiently serious deprivation. To proceed with an Eighth Amendment claim plaintiff must raise a triable issue on both the subjective and objective prongs for his claim to survive summary judgment. For all these reasons, summary judgment is granted for defendants.

**Qualified Immunity**

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Id.* at 205. A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling the sequence of the two-part test that required determining a deprivation first and then deciding whether such right was clearly established, as required by *Saucier*). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Pearson*, 555 U.S. at 236.

The existence of a triable issue as to whether a prison official was deliberately indifferent to an inmate's health or safety may require denial of a defense motion for summary judgment on the merits of the Eighth Amendment claim, but the qualified immunity analysis does not end there. *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002); *see id.* at 1049 ("*Saucier's* key point is that the qualified immunity inquiry is separate from the constitutional inquiry"). "Even though the constitutional issue turns on the officers' state of mind (here, deliberate indifference to a substantial risk of serious harm), courts must still consider whether assuming the facts in the injured party's favor it would be clear to a reasonable officer that his conduct was unlawful." *Estate of Ford*, 301 F.3d at 1045. That is, the court must consider whether the information available to the defendants made it so clear that the plaintiff would be harmed that no reasonable officer could have allowed the situation to occur. *Id.*

For an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must *subjectively* have a sufficiently culpable state of mind, i.e., "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity." *Id.* at 1050 (citation omitted) (quoting *Farmer*, 511 U.S. at 834, and citing *Saucier*, 533 U.S. at 205). Although the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at

11

1 what point a risk of inmate assault becomes sufficiently substantial for Eighth
2 Amendment purposes.'" *Id.* at 1051 (quoting *Farmer* at 834 n.3).  Because it had not
3 been fleshed out, "it would not be clear to a reasonable prison official when the risk of
4 harm from double-celling psychiatric inmates with one another changes from being *a* risk
5 of *some* harm to a *substantial* risk of *serious* harm.  *Farmer* left that an open issue.  This
6 necessarily informs 'the dispositive question' of whether it would be clear to reasonable
7 correctional officers that their conduct was unlawful in the circumstances that [they]
8 confronted." *Id.* at 1051.  Each of the defendants in *Ford* was entitled to qualified
9 immunity even though he was aware of some information that there was *some* risk in
10 double-celling the violent inmate with the decedent or any other inmate.

11 Similar to qualified immunity being found in *Estate of Ford* because of the
12 undefined qualitative elements, qualified immunity is appropriate in this case because of
13 the undefined qualitative elements in *Helling*.  *Cf. A.D. v. Cal. Highway Patrol*, 712 F.3d
14 446, 455 n.4 (9th Cir. 2013) (denying qualified immunity for a substantive due process
15 claim; "[t]he standard for a due process violation – purpose to harm unrelated to a
16 legitimate law enforcement objective – does not contain undefined qualitative elements
17 ("substantial risk" and "serious harm") like the Eighth Amendment standard does.").
18 *Helling* found that whether exposure to "unreasonably high levels" of a toxic substance
19 violates the Eighth Amendment "requires more than a scientific and statistical inquiry into
20 the seriousness of the potential harm and the likelihood that such injury to health will
21 actually be caused by exposure to [the toxic substance].  It also requires a court to
22 assess whether society considers the risk that the prisoner complains of to be so grave
23 that it violates contemporary standards of decency to expose *anyone* unwillingly to such
24 a risk.  In other words, the prisoner must show that the risk of which he complains is not
25 one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

26 The cases cited earlier show that not all exposure to asbestos amounts to
27 objectively serious conduct, and that no court has articulated a well-defined test that a
28 reasonable prison official could look to in order to determine the lawfulness of his actions.

12

*Wallis*, for example, found an Eighth Amendment violation for an inmate who directly handled already damaged asbestos-containing materials in a confined space for about 45 hours. Yet, courts have rejected claims of Eighth Amendment violations from an inmate who worked for about an hour removing asbestos mastic and tiles (*Templeton v. Anderson)*, an inmate who was exposed to asbestos dust for a few hours (*Smith v. Howell*), and an inmate who was housed for ten months near asbestos-covered (but undisturbed) pipes (*McNeil v. Lane*). Because lower courts have reached different results in determining whether exposure to a given toxic substance is an unreasonably high level so as to amount to an objectively sufficient serious condition highlights the difficulty that a reasonable prison official would have in determining whether his conduct was unlawful when inmates are exposed to or work with toxic substances. The same problem exists for lead paint. No court has articulated a well-defined test that a reasonable official could look to in order to determine the lawfulness of his actions in allowing prisoners to be exposed to lead paint.

Defendants are therefore entitled to qualified immunity for plaintiff's claim that they were deliberately indifferent based on the asbestos and lead exposure because, as set forth above, the facts in the record do not show the violation of a constitutional right by them. *See Saucier*, 533 U.S. at 201 (defendants prevail on qualified immunity if there was no constitutional violation). The undefined contours as to what amounts to "unreasonably high levels," *Helling*, 509 U.S. at 35, of a toxic substance (such as asbestos or lead) to satisfy the objective prong of an Eighth Amendment analysis also provides another basis for qualified immunity. Based on the undisputed facts of this case and the minimal, if any, exposure to lead and asbestos in the mattress factory, the defendants could have believed reasonably and mistakenly that the risk was not sufficiently substantial to violate the Eighth Amendment. For all these reasons, defendants are entitled to qualified immunity.[4]

---

[4] As the court has not found a constitutional violation and that defendants are entitled to qualified immunity, the arguments that plaintiff failed to exhaust his administrative

13

**CONCLUSION**

1. For the reasons set forth above, the motions for summary judgment (Docket Nos. 26, 28) are **GRANTED**.

2. The clerk shall close the file

**IT IS SO ORDERED.**

Dated: June 29, 2017

PHYLLIS J. HAMILTON
United States District Judge

\\candoak.cand.circ9.dcn\data\users\PJHALL\_psp\2016\2016_01098_Thao_v_Dobie_(PSP)\16-cv-01098-PJH-sj.docx

---

remedies or failed to state a claim with respect to defendant Young will not be addressed.

14